Lauren Tabaksblat
Michael J. Bowe
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Telephone:  212.209.4800
Facsimile: 212.938.2852
ltabaksblat@brownrudnick.com
mbowe@brownrudnick.com
*Attorneys for Plaintiff*
*Blueprint Capital Advisors, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLUEPRINT CAPITAL ADVISORS, LLC, | )<br>)<br>) |
| | ) Civil Action No. |
| Plaintiff, | ) |
| | ) Underlying Action: |
| v. | ) Civil Action No.: 2:20-cv-07663, |
| | ) United States District Court for the District of |
| STATE OF NEW JERSEY, et al., | ) New Jersey |
| | ) |
| Defendants. | ) |
| | ) |

## BLUEPRINT CAPITAL ADVISORS, LLC'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO COMPEL DOUG OSTROVER AND
## ALAN KIRSHENBAUM TO COMPLY WITH SUBPOENAS

# TABLE OF CONTENTS

Page

INTRODUCTION......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 4

LEGAL STANDARD .................................................................................................. 15

ARGUMENT ............................................................................................................... 16

   I.    THE DOCUMENTS SOUGHT BY THE SUBPOENAS ARE
       HIGHLY RELEVANT.......................................................................... 16

   II.   THE SUBPOENA RECIPIENTS HAVE AN OBLIGATION
       TO COMPLY WITH THE SUBPOENAS. ........................................ 19

CONCLUSION ............................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Boyle v. United States*,
  556 U.S. 938 (2009) ............................................................................................................... 19

*Citizens Union of City of N.Y. v. Attorney General of N.Y.*,
  269 F. Supp. 3d 124 (S.D.N.Y. 2017) ..................................................................................... 16

*Const. Bank v. Levine*,
  151 F.R.D. 278 (E.D. Pa. 1993) .............................................................................................. 19

*Cox v. German Kitchen Center LLC*,
  2020 WL 5235748 (S.D.N.Y. Sept. 2, 2020) .......................................................................... 15

*Emcore Corp. v. PricewaterhouseCoopers LLP*,
  102 F. Supp. 2d 237 (D.N.J. 2000) ......................................................................................... 19

*Gov't Emps. Ins. Co. v. Pomerantz*,
  2022 WL 1081038 (D.N.J. Apr. 11, 2022) ............................................................................. 19

*In re Refco Sec. Litig.*,
  759 F. Supp. 2d 342 (S.D.N.Y. 2011) ..................................................................................... 16

*In re Weatherford Int'l Sec. Litig.*,
  2013 WL 5788687 (S.D.N.Y. Oct. 28, 2013) ......................................................................... 16

*LifeScan, Inc. v. Smith*,
  2024 WL 4913025 (D.N.J. Feb. 1, 2024)................................................................................. 17

*Lord Abbett Inv. Tr.-Lord Abbett Short Duration Income Fund v. Valeant Pharms. Int'l, Inc.*,
  2018 WL 3637514 (D.N.J. July 31, 2018) .............................................................................. 17

*Oakley v. MSG Networks, Inc.*,
  2025 WL 72111 (S.D.N.Y. Jan. 9, 2025).......................................................................... 16, 20

*Oasis Med., Inc. v. I-Med Pharma USA Inc.*,
  2023 WL 6301728 (S.D.N.Y. Sept. 1, 2023) .......................................................................... 16

*Owen v. No Parking Today, Inc.*,
  280 F.R.D. 106 (S.D.N.Y. 2011) ............................................................................................ 20

*Pacitti v. Macy's*,
   193 F.3d 766 (3d Cir. 1999) ........................................................................... 18

*See United States ex rel. Ortiz v. Mount Sinai Hosp.*,
   169 F. Supp. 3d 538 (S.D.N.Y. 2016) ............................................................. 20

*Siemens Indus., Inc. v. Great Midwest Ins. Co.*,
   2024 WL 3305602 (S.D.N.Y. June 4, 2024) .................................................... 20

*Sky Med. Supply Inc. v. SCS Support Claim Servs., Inc.*,
   2017 WL 1133349 (E.D.N.Y. Mar. 24, 2017) .................................................. 20

*Walker v. Carter*,
   2015 WL 9450843 (S.D.N.Y. Dec. 23, 2015) .................................................. 16

**Rules**

Fed. R. Civ. P. 26(b) .................................................................................... 16, 20

Fed. R. Civ. P. 45(d)(2)(B)(i) ............................................................................ 15

Pursuant to Federal Rule of Civil Procedure 45(d)(2)(B)(i), Blueprint Capital Advisors, LLC ("BCA") hereby submits this Memorandum of Law in Support of its Motion to Compel (the "Motion") Doug Ostrover and Alan Kirshenbaum (the "Subpoena Recipients") to produce documents and communications responsive to Blueprint's July 16, 2024 subpoenas *duces tecum* (the "Subpoenas").

## INTRODUCTION

On June 23, 2020, BCA, New Jersey's largest African American-owned asset management firm, commenced suit in federal court in the District of New Jersey against the New Jersey Division of Investment and its preferred white partners, including defendant Owl Rock (the "Underlying Action").[1]  BCA's amended complaint details the systemic institutional racism that BCA has and continues to suffer.  It began in 2015 when BCA presented a proprietary and groundbreaking asset management program to the New Jersey Division of Investment ("DOI"), which at the time was receiving intense criticism for its poor investment returns and the excessive fees and costs it was paying Wall Street firms for those poor results.  After inducing BCA to share all the research, modeling, and work underlying its proprietary FAIR program with promises to implement the program through BCA, the DOI instead misappropriated the program and launched it with one of its preferred business partners, defendant Blackrock.  Defendant Timothy Walsh—working as an undisclosed agent for defendant Owl Rock and its principals Doug Ostrover and Alan Kirshenbaum—brokered the deal between the DOI and Blackrock in exchange for an anchor investment for their new fund.  In the process of stealing and trading BCA's intellectual property for a lucrative mandate from the DOI and an investment from

---

[1]  After the commencement of the Underlying Action, Owl Rock changed its corporate name to Blue Owl.  BCA will refer to the entity as Owl Rock for consistency with the documents during the relevant time period.

BlackRock, they violated ethics laws and knowingly made false statements to the DOI and its consultant, with the net result of enriching themselves and causing irreparable harm to BCA's business.

At the time, former New Jersey DOI director Walsh had reached the end of his post-DOI mandatory "cooling-off" period and was seeking to cash in on his DOI connections to secure new employment. Walsh was a close personal friend of then-DOI director, defendant Christopher McDonough, and Senior Portfolio Manager, defendant Jason MacDonald, from his time at DOI where he supervised both. Walsh also knew BCA's founder, Jacob Walthour, and presented himself to Walthour as someone who was excited about the innovation that BCA had created and could advise BCA in its negotiations with the DOI. Based on those representations, BCA added Walsh to its advisory board and provided him with unrestricted access to information about BCA's proprietary FAIR program. He did so despite knowing (and misrepresenting to Walthour) that the DOI was, in the words of McDonough, "not a fan of investing with women and minority-owned firms," "would not approve" a meaningful allocation of pension funds to a Black investment advisor, and the DOI would work with BCA only as long as necessary to divert the FAIR program to an established "old-boy" Wall Street firm.

For the next year, Walsh schemed to redirect the FAIR program to Blackrock, with whom he had a close relationship and to which he previously awarded hundreds-of-millions in assets to manage when he was at the DOI. He did so in exchange for a $600 million anchor investment for his new fund Owl Rock. The DOI mandate to Owl Rock was approved in record time and announced on the very same day that the DOI announced it would implement BCA's FAIR program with Blackrock. Within days of that announcement, Owl Rock publicly announced Walsh's position as Managing Director and Head of Client Partnerships that had been awarded

2

months earlier, but which Walsh and Owl Rock internally determined to conceal until "after NJ closes." BCA, in turn, was left stripped of its prized asset and has incurred hundreds-of-millions of dollars in damages, which continue to this day.

In a 102-page decision, the District Court sustained BCA's claims against Owl Rock for unfair competition, aiding and abetting racketeering, aiding and abetting fraud, and civil conspiracy, and claims against Walsh for violations of the federal and New Jersey state RICO statutes, fraud, breach of fiduciary duty, civil conspiracy, and breach of contract.

Discovery produced to date confirms that Ostrover and Kirshenbaum directed and sanctioned Owl Rock's and Walsh's scheme. Ostrover recruited Walsh to secure an anchor DOI investment, coordinated the plan to handoff the BCA model to BlackRock as a *quid pro quo* for that mandate, paid and promoted Walsh for his efforts, and was kept fully apprised by Walsh of his secret meetings and phone calls with BlackRock and the DOI throughout this period. Kirshenbaum, in turn, spearheaded the efforts to conceal Walsh's true role at Owl Rock since he and Owl Rock knew it would preclude the anchor investment Walsh and Owl Rock sought and needed.

Accordingly, when BCA issued Rule 45 subpoenas for Ostrover's and Kirshenbaum's personal documents and messages on July 16, 2024, counsel for Ostrover and Kirshenbaum did not dispute that the Subpoena Recipients possessed responsive documents. The parties met and conferred and reached an agreement on search and production parameters. Counsel for Ostrover and Kirshenbaum even represented in writing that they had commenced review for documents responsive to the Subpoenas.

On November 6, 2024, however, the Subpoena Recipients reneged on their prior agreement, instead conditioning compliance on BCA's withdrawal of three supplemental

document requests served on Owl Rock, or, alternatively, the withdrawal of one of the Subpoenas.  Neither Owl Rock nor the Subpoena Recipients provided any legal basis to condition compliance with a third-party subpoena on BCA waiving its right to party discovery.  Counsel to BCA has repeatedly met and conferred with counsel to the Subpoena Recipients and Owl Rock, most recently on January 24, 2025, to attempt to resolve this dispute to no avail.

Accordingly, BCA brings this motion to compel in the forum of compliance.

## FACTUAL BACKGROUND

On June 23, 2020, BCA commenced the Underlying Action in the District of New Jersey, and filed the operative, amended complaint on November 23, 2020.  (Ex. 1 (Am. Compl.).)[2]  By order dated December 23, 2022, Judge Julien Xavier Neals sustained the majority of BCA's claims on the defendants' motions to dismiss.  (Ex. 2 (Opinion).)  Among those claims that Judge Neals sustained were claims that Owl Rock and its employees conspired with the DOI and its employees to misappropriate a proprietary investment program developed by BCA in exchange for a $600 million anchor investment from the DOI.

In December 2015, former Blackstone Senior Managing Director Doug Ostrover informed Walsh that he was founding a new company, Owl Rock, and wanted New Jersey to be one of the firm's anchor investors.  (Ex. 3 (BCA_0061546, Dec. 18, 2015 email from Walsh to Walthour, "Doug [Ostrover] is extra sensitive about his venture so please keep it very qt.").)[3]  At the time, Walsh was serving as an advisor to BCA, but he had his eye on other opportunities that

---

[2]  All exhibits herein are to the March 4, 2025 Declaration of Lauren Tabaksblat In Support of Plaintiff Blueprint Capital Advisors, LLC's Motion to Compel Compliance With Subpoenas. (*See* Exhibit A.)

[3]  On February 21, 2025, Judge Carter granted BCA's motion to file this Memorandum of Law and Exhibit 6 to the Declaration of Lauren Tabaksblat partially under seal.  *See Blueprint Capital Advisors, LLC v. State of New Jersey*, No. 1:25-mc-00063-ALC (S.D.N.Y.), Dkt. 5.

he hoped would prove more lucrative. He had just reached the end of his post-DOI mandatory "cooling off period," had left his job at real estate organization GAW Capital, and was looking for a way to leverage his DOI connections for permanent work. (Ex. 1 at 17, ¶ 59.) Ostrover presented the perfect opportunity. Walsh and the DOI had a lengthy history with Ostrover, with Walsh previously having approved hundreds-of-millions of investment dollars to GSO Capital Partners, a firm co-founded by Ostrover, while he was the director of the DOI. (Ex. 4 (June 30, 2011 DOI Investment Memorandum proposing investment in GSO Capital Opportunities Fund II, L.P.).)

Walsh knew from his years working at the DOI that the DOI was not a fan of investing in minority owned companies and would never turn to a minority owned company to address the significant pension fund crisis it was facing. But Walsh knew the FAIR program BCA had created was just the solution the DOI needed. With his deep industry connections, he was the ideal person to help the DOI broker the FAIR program deal with an alternative, preferred partner. Walsh knew that if he could secure a different partner for the FAIR program for the DOI, the DOI would be more than willing to return the favor with a mandate to Owl Rock.

Walsh was close personal friends with key DOI officials, including McDonough and Senior Portfolio Manager Jason MacDonald, who held the keys to New Jersey's approval of both Owl Rock's and BCA's proposals. Walsh knew McDonough and MacDonald from his time as DOI director, where he supervised both. But their relationship was more than simply professional. In fact, Walsh, McDonough, and MacDonald were "drinking buddies" who regularly partied, dined, and went golfing together. (Ex. 5 (BCA_0000322, June 23, 2015 email stating that Walsh is "golfing w McDonough in an hour"); Ex. 6(a) (ROSENSTOCK_000523, May 24, 2019 email extending Walsh, McDonough, and MacDonald a party invitation); Ex. 7

(BCA_0000421 at -21, Sept. 23, 2015 email stating that Walsh is "golfing with Jason [MacDonald] on Thursday and having drinks with Chris [McDonough] that afternoon").)  Walsh even resided at MacDonald's home for extended periods, including between 2015-2016 when BCA and Owl Rock were negotiating their programs with the DOI (Ex. 1 at 16, ¶ 57), despite New Jersey Ethics Codes which prohibit state employees from "knowingly act[ing] in any way that might reasonably be expected to create an impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his trust as a State . . . employee."  *See* N.J.S.A. § 52:13D-23(e)(7).

Walsh, Ostrover, and Alan Kirshenbaum were well aware of these ethical rules and plainly understood that Walsh's former role as DOI director and close friendship with former subordinates McDonough and MacDonald would have prevented the NJ State Investment Council from approving Owl Rock's investment.  Thus, they went to great lengths – even knowingly violating ethics laws and placement agent bans – to keep Walsh's affiliation with Owl Rock as a third-party marketer a secret.  Engaging Walsh as an undisclosed third-party marketer was itself illegal, as the DOI's Placement Agent Policy "require[s] full disclosure by the general partner regarding its use of placement agents," and is explicit that without full disclosure, "no investment will be made by DOI."  (Ex. 8.)  To conceal Walsh's role, Kirshenbaum regularly kept Walsh off written communications with the DOI to avoid a paper trail, while simultaneously soliciting his input and assistance internally and encouraging him to liaise with the DOI offline (including his housemate MacDonald).  (*See, e.g.*, Ex. 6(y) (ORCC_00002051 at -51-56, emails between Kirshenbaum and MacDonald discussing potential Owl Rock investment and omitting Walsh from email chain); Ex. 6(s) (TW_R45_00004326, ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████;
Ex. 6(b) (TW_R45_00001511 at -11-12, ████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████); Ex. 6(m) (TW_R45_00001332 at -32-33, █████████████████████

█████████████████████████████████████████████████).)

Kirshenbaum even went so far as to explicitly lie in response to a question from the DOI's

consultant, TorreyCove, as to whether Owl Rock had engaged a placement agent in connection

with the DOI mandate.  (Ex. 6(c) (TW_R45_00000662 at -69, ██████████████████

████████████████████████████████████    ████████████████

██████████████████████████████████████████

██████████████████████████.  (*See* Ex. 6(m) (TW_R45_00001332 at -32, ████████

██████████████████████████████████████████████████████

██████████████████████████████████████

████████████; Ex. 6(d) (TW_R45_00000678 at -78, ████████████████████

████████████████████████.) ██████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████ (Ex. 6(c) (TW_R45_00000662 at -69,

██████████████████████████████████████████████).)

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ (*Id.*)  In any event, Walsh's close friends, McDonough and MacDonald, were

well aware of Walsh's work for Ostrover and Kirshenbaum's Owl Rock venture, but failed to

disclose his involvement to the State Investment Council given the conflicts described above.

(Ex 6(z) (ORCC_00000196, McDonough and MacDonald attend ██████████████

█████████████████████████ meeting as "Potential Investors/Clients," ████████████

████████████); Ex. 6(aa) (ORCC_00001730 at -30, -32, July 27, 2016 email from a DOI

employee to Kirshenbaum attaching a draft SIC memo omitting Walsh from Owl Rock's

"experienced investment team").)

Walsh's, Ostrover's, and Kirshenbaum's plan played out exactly as intended.  On

December 22, 2015, just days after Walsh began working for Owl Rock, the DOI informed

Blueprint that it had decided against bringing BCA's proposal to the State Investment Council at

its upcoming January 2016 meeting as previously planned and communicated and would instead

try again in March.  (Ex. 9 (JW_0001185, Dec. 22, 2015 email from Walthour to Walsh saying

"Looks like we are getting pushed off to March").)  As BCA would later learn, this was simply

pretext to give Walsh and the DOI additional time to secure a replacement firm for BCA.

Walsh was well acquainted with BlackRock from his time as DOI Director where he led

a number of investment deals between the DOI and BlackRock.  (Ex. 10 (Nov. 2, 2012 DOI

Investment Memo proposing $400 million investment in SONJ Private Opportunities Fund II,

L.P.).)  One of those investment deals was an evergreen deal that was negotiated by BlackRock's

award-winning Black representative to the DOI, Obie McKenzie, but awarded to Walsh's close

friend, Donald Perault.  (*See id.*; Ex. 11 (BCA_0128887, McKenzie states during a phone

conversation with Walthour that BlackRock "ripped me off of the account, because [Perault] was

an Irish white boy who used to drink beer with [Walsh]"); Ex. 6(p) (BLK-000025889 at -89-90,

███████████████████████████████████████████████████████████

██████████████████████████████████); Ex. 6(q) (BLK-000033361,

Aug. 3, 2010 email from Perault to Walsh, "How is the new gig?  Ready for me to start

coverage??").)  Walsh and Perault remained close friends even after Walsh left the DOI,

regularly golfing and viewing sporting events, and meeting for lunch and drinks.  (Ex. 6(v)

(BLK-000008972 at -72-73, May 2015 emails scheduling lunch; Ex. 6(u) (BLK-000010322

at -22-23, Aug. 2013 emails discussing golf plans); Ex. 6(w) (BLK-000010302 at -02, Nov. 2014

emails discussing sports and reconnecting over drinks).)  And they sought each other's help

when it came to career opportunities.  In September 2015, for example, before Walsh joined Owl

Rock, he turned to Perault for help concerning a potential job opportunity as CIO of South

Carolina's pension fund.  (Ex. 6(x) (BLK-000008945 at -45-46, Sept. 2015 email from Perault

telling Walsh to "Give me a buzz . . . and I will give you the lowdown" on opportunities with the

SC Pension Fund).)  With Perault as a connection, BlackRock was the perfect fit to partner with

the DOI to implement BCA's FAIR program.

Thus, throughout early 2016, Walsh, McDonough and MacDonald worked with

BlackRock to implement BCA's FAIR program and business plan as a BlackRock platform.

During this process, BlackRock was provided with all the details of BCA's proprietary program,

███████████████████████████████████████████████ (Ex. 6(n) (BLK-000005097

at -97-98, ████████████████████████████████████████████████

██████████████████████████████).)  Ostrover was contemporaneously

apprised of Walsh's efforts and discussions.  (*See, e.g.*, Ex. 6(o) (TW_R45_00001247 at -47,

Feb. 27, 2016 email from Walsh to Ostrover, "Want to follow up on Don [Perault]").)

During this same period that Walsh was meeting with Blackrock, he regularly met with his friends at the DOI to discuss the FAIR deal and his proposed $600 million investment in Owl Rock.  After an early March 2016 meeting with the DOI, ███████████████████ ███████████████████████████████████████████████████████████ ████████████████████████—even though Owl Rock had been formed just a few months earlier and at that time did not have a single client or dollar under management, and notwithstanding numerous reports highlighting the financial and regulatory issues with business-development-company funds, like Owl Rock, ████████████████████ (Ex. 6(e) (TW_R45_00004344 at -45, ██████████████████); Ex. 6(f) (TW_R45_00000646 at -51-52, Owl Rock's Mar. 2, 2016 Form ADV reporting no assets under management); Ex. 6(g) (ORCC_00001848 at -48-52, ████████████████ ████████████████████████████████████████████████████ ██████████).) ██████████████████████████████████ and the following week, on March 13, 2016, Owl Rock awarded Walsh with the position of managing director and Head of Client Partnerships, with a lucrative ██████████ plus bonuses for only part-time work.  (Ex. 6(e) (TW_R45_00004344 at -44, ███████████████████ ██████████); Ex. 6(h) (ORCC_00005829 at -29-30, Mar. 13, 2016 executed offer of employment to Walsh).)

Similarly, on March 30, 2016, Walsh met with MacDonald and the DOI's Head of Alternative Investments, Samantha Rosenstock, over dinner at the Rattle n' Hum restaurant in New York City.  Rosenstock, who with MacDonald was intimately involved with the DOI's evaluation of BCA's FAIR program, was neither assigned to nor had any involvement whatsoever with the Owl Rock proposal.  (Ex. 6(r) (ORCC_00002258 at -58-59, Owl Rock

expense reimbursement form from Walsh requesting reimbursement for March 30, 2016 dinner with MacDonald and Rosenstock).)  The true purpose of the meeting was for Walsh to finalize his deal with the DOI to trade the BlackRock deal for an anchor investment with Owl Rock. Consistent with that purpose, Walsh, who attended the meeting with Owl Rock's full knowledge and endorsement, requested reimbursement for the meal from Owl Rock as a business expense. (*Id.*)

In April, Walsh finally informed Walthour that "NJ is negotiating with someone very, very big" to do the FAIR program.  (Ex. 1 at 27, ¶ 85.)  Of course, Walsh knew that the firm was BlackRock, but failed to disclose the fact to Walthour and said just enough to deflect suspicion from him when the opportunity was ultimately diverted.  On or about May 3, 2016, McDonough confirmed to Walthour that the DOI had decided against investing with BCA.

Throughout this period, Owl Rock continued to conceal Walsh's employment from public disclosure, recognizing the ethical issues it could raise with respect to the approval of its $600 million program.  For example, ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ (Ex. 6(i) (ORCC_00002058 at -58, Apr. 4, 2016 email from Kirshenbaum to Owl Rock team).)  On April 6, Kirshenbaum emailed Jason MacDonald Owl Rock's organizational chart; Walsh was conspicuously absent.  (Ex. 6(j) (ORCC_00001428 at -28-29).)  And in August 2016, Lipschultz and Walsh unsuccessfully tried to "kill" a story by Anastasia Donde, a reporter for Private Debt Investor, concerning Walsh's employment with Owl Rock because they wanted to wait until "after NJ closes" to "give them more complete background."  (Ex. 6(l) (ORCC_00008977 at -77-79).)

Even though Walsh, Kirshenbaum, Ostrover, and other Owl Rock executives failed to disclose Walsh's role publicly, as set forth above, the DOI was well aware. (*Supra* at 7-8.) Nevertheless, consistent with the DOI's pattern of disparate treatment of BCA, McDonough and MacDonald endorsed Walsh's director role at Owl Rock and supported it. They took a completely different approach with BCA – which had fully disclosed Walsh's non-paid, non-decision-making position with BCA – demanding Walsh's resignation and purporting to commence an ethics investigation in 2016, with which BCA complied. (Ex. 12 (BCA_0003378, Nov. 15, 2018 email from Walthour to the DOI questioning the ethics ruling after removing Walsh from BCA's advisory board).) Of course, this was all pretext for not proceeding with BCA and for the years-long delay before finally issuing a far more limited mandate.

In August 2016, the State Investment Council approved BlackRock's FAIR program, which was identical to the program BCA had developed, shared with Walsh and the DOI, and had been assured they would pursue together and would remain confidential. Remarkably, the DOI did not even change the name Blueprint had coined. At the same meeting, the Council approved a $600 million commitment to Owl Rock, which had completed the due diligence and approval processes in record time for a new fund, despite, like BCA, having been formed only a few months earlier and having had no prior investment relationship with New Jersey. (Ex. 13 (BCA_0114671 at -73-74, Aug. 3, 2016 State Investment Council meeting minutes discussing approval of Owl Rock and BlackRock proposals).) The speed at which the DOI reviewed and approved the similarly situated Owl Rock (six months from Alan Kirshenbaum's initial outreach to MacDonald in February) was particularly remarkable given Walsh's own acknowledgment

██████████████████████████████████████████████████████

████████████████████████████████████████. (Ex. 6(e)

(TW_R45_00004344 at -45, ██████████████████████████████

████████████████); Ex. 6(s) (TW_R45_00004326, ████████████████

████████████████████████████████████████████████████████

████████████████████████.)

Less than two weeks later, on August 16, 2016, Anastasia Donde released the story that Walsh and Owl Rock had unsuccessfully endeavored to kill, finally disclosing Walsh's months-long employment with Owl Rock.  (Ex. 6(t) (ORCC_00009037 at -37-38, Aug. 16, 2016 email from Anastasia Donde to Brandon Messina providing story about Walsh's employment with Owl Rock).)

Obie McKenzie, BlackRock's former Black representative to the DOI, confirmed this *quid pro quo* in a 2020 internal email to BlackRock's Chief Client Officer Mark McCombe:

> Mark . . .
>
> I will tell you off the record, when we are together, what happened there.
>
> These back room deals negatively impacting African Americans happen all the time.  I experienced the brunt of them many times, but did not complain just to keep the peace in a racially lopsided environment.
>
> I know the consultant [Perault] here knows the facts as to where the strategy came from.
>
> You should also know that Walsh left New Jersey with a $600 million account (hmm) on his way to his new job.
>
> This is not your first Rodeo Mark.  There are things that go on behind the scenes, especially in the public funds sector where there are sometimes ethnic allegiances, that are not obvious to the unwashed.
>
> Epictetus once said that 'some things that are do not appear to be." Especially when the power of a large company generally always prevails.
>
> The truth will prevail.

(Ex. 14 (BCA_0119904).)

13

The relationship between the DOI and Owl Rock—built on deceit, misrepresentations, and the backs of BCA's founders—has ultimately earned Doug Ostrover, Alan Kirshenbaum, and their Owl Rock partners billions, and has allowed them to build reputations in the industry that have led to numerous additional lucrative deals with other state pensions, acquisitions, and an initial public offering.

## PROCEDURAL HISTORY

On February 3, 2023, BCA served document demands on Owl Rock.  (Ex. 15 (Feb. 3, 2023 First Set of RFPs to Owl Rock).)  Demonstrating Ostrover's and Kirshenbaum's key roles, Owl Rock identified them as relevant custodians and collected and produced their emails from the Owl Rock server.  (Ex. 16 at 3 (Dec. 1, 2023 Owl Rock Amended Rule 26(a)(1) Initial Disclosures).)  When BCA requested that Owl Rock search for personal emails and electronic messages, Owl Rock initially agreed, but subject to unacceptable terms.  (Ex. 17 at 7 (June 16, 2024 Joint Status Letter).)  Accordingly, on July 16, 2024, Blueprint served subpoenas on Ostrover and Kirshenbaum.  (Ex. 18 (July 16, 2024 subpoena to Alan Kirshenbaum ("Kirshenbaum Subpoena")); Ex. 19 (July 16, 2024 subpoena to Doug Ostrover ("Ostrover Subpoena")).)  The Subpoenas specified the place of compliance as the Brown Rudnick LLP offices at 7 Times Square, New York, NY 10036.  (Ex. 18 at 5; Ex. 19 at 5.)  The Subpoenas seek personal emails and electronic messages concerning Ostrover's and Kirshenbaum's relationship with the defendants in the Underlying Action and their role and knowledge in the scheme alleged in BCA's amended complaint.  (Ex. 18 at 17-19; Ex. 19 at 17-19.)

On July 30, 2024, the Subpoena Recipients served responses and objections to the requests, and the parties proceeded to negotiate the parameters of the Subpoena Recipients' compliance.  (Ex. 20 (Kirshenbaum's responses and objections); Ex. 21 (Ostrover's responses

and objections); Ex. 22 (email correspondence between counsel for BCA and the Subpoena

Recipients.)  Blueprint and the Subpoena Recipients met and conferred for months to negotiate

search terms and parameters for the Subpoenas to narrow the scope and reduce any burden to the

Subpoena Recipients.  (*See* Ex. 22.)  On October 2, 2024, the Subpoena Recipients confirmed

that they were "working diligently to collect, review, and produce documents responsive to

[BCA's] requests."  (*Id*. at 1.)

On November 6, 2024, however, BCA was informed by counsel to Owl Rock and the

Subpoena Recipients that the Subpoena Recipients refused to honor their agreement to produce

any documents in response to the Subpoenas.  Instead, the Subpoena Recipients attempted to

condition their compliance on BCA's withdrawal of certain document requests served on Owl

Rock, or its withdrawal of one of the Subpoenas.  (Ex. 23 (Nov. 14, 2024 Letter from Kirkland &

Ellis LLP).)  BCA refused to accede to Owl Rock's baseless demands.  Counsel for BCA has

met and conferred several times in an attempt to resolve this dispute, including most recently on

January 24, 2025.  (Tabaksblat Decl. ¶ 7.)  The Subpoena Recipients have refused to

compromise or substantiate their position.

## LEGAL STANDARD

Trial courts have wide discretion to compel discovery from third-party subpoena

recipients.  *Cox v. German Kitchen Center LLC*, 2020 WL 5235748, at *5 (S.D.N.Y. Sept. 2,

2020).  Federal Rule of Civil Procedure 45(d)(2)(B)(i) permits a party who has served a

subpoena to "move [in] the court of the district where compliance is required for an order

compelling production or inspection."[4]  The nonparty resisting compliance with the subpoena

---

[4] This Court has jurisdiction to hear and resolve this matter as the Subpoenas each specified the
place of compliance as the Brown Rudnick LLP offices at 7 Times Square, New York, NY
10036.  *See* Fed. R. Civ. P. 45(d)(2)(B)(i).

bears the burden of showing that the requests are improper. *Citizens Union of City of N.Y. v. Attorney General of N.Y.*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).

"Subpoenas issued under Rule 45 are subject to the relevance requirement of Rule 26(b)(1)." *Oasis Med., Inc. v. I-Med Pharma USA Inc.*, 2023 WL 6301728, at *8 (S.D.N.Y. Sept. 1, 2023) (citing *In re Refco Sec. Litig.*, 759 F. Supp. 2d 342, 345 (S.D.N.Y. 2011)). Pursuant to Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The information sought is discoverable so long as it is "reasonably calculated to lead to the discovery of admissible evidence." *In re Weatherford Int'l Sec. Litig.*, 2013 WL 5788687, at *2 (S.D.N.Y. Oct. 28, 2013).

## ARGUMENT

### I.    THE DOCUMENTS SOUGHT BY THE SUBPOENAS ARE HIGHLY RELEVANT.

After conceding they possess relevant documents, finalizing an agreement on the scope of compliance, and confirming that they were "working diligently to collect, review, and produce documents responsive to [BCA's] requests," the Subpoena Recipients have changed positions and now assert that the Subpoenas seek documents that are not relevant and are disproportionate to the needs of the case. (Ex. 22 at 1; Ex. 23.) The Subpoenas, however, are narrowly tailored and seek responsive emails, text messages and other mobile communications that are directly relevant to BCA's claims and plainly discoverable under Rules 26 and 45. *See, e.g.*, *Oakley v. MSG Networks, Inc.*, 2025 WL 72111, at *3 (S.D.N.Y. Jan. 9, 2025) (denying motion to quash subpoena request for "personal emails, text messages, and messages on other applications" and rejecting argument that prior order limiting party discovery limited non-parties' discovery obligations); *Walker v. Carter*, 2015 WL 9450843, at *1-3 (S.D.N.Y. Dec. 23, 2015) (ordering

16

sanctions against non-party's attorney for failure to produce relevant text messages). Indeed, prior to the Subpoena Recipients' complete refusal to comply, BCA had taken substantial efforts to negotiate the scope of the Subpoena Recipients' compliance to resolve any concerns as to relevance and burden.

The Subpoenas seek documents and communications related to Owl Rock's role in aiding and abetting the fraud and RICO enterprise that Federal District Court Judge Neals sustained, including documents and communication concerning Owl Rock's relationship and communications with BlackRock (the recipient of BCA's misappropriated trade secrets) and BlackRock's facilitation of the DOI's co-investment in Owl Rock funds (the reward to Owl Rock in assisting the corrupt enterprise). (*See supra* at 8-13; Exs. 18 & 19 at 18-19, request nos. 9, 12, & 16.) The Subpoenas target the time period during which defendant Walsh developed his relationship with key persons at the DOI and at BlackRock, continuing through mid-2020 when BlackRock created a co-investment vehicle for the DOI to invest in certain Owl Rock funds. (*See supra* at 8-13; Ex. 22 at 3 (Subpoena Recipients agreeing to produce documents through July 2020 for request no. 16).) The documents sought by the Subpoenas are directly relevant to Owl Rock's substantial assistance to and knowledge of the RICO Enterprise, and its motive to obtain these *quid pro quo* investments from the DOI and BlackRock. *See, e.g.*, *Lord Abbett Inv. Tr.-Lord Abbett Short Duration Income Fund v. Valeant Pharms. Int'l, Inc.*, 2018 WL 3637514, at *6 (D.N.J. July 31, 2018) (To assert a claim for aiding and abetting racketeering, plaintiffs must allege "(1) that an independent wrong exists; (2) that the aider or abettor knows of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong[.]"); *LifeScan, Inc. v. Smith*, 2024 WL 4913025, at *7 (D.N.J. Feb. 1, 2024) (compelling production of documents responsive to third party subpoenas for information relevant to an alleged

fraudulent RICO scheme, noting it is "'well recognized that the federal rules allow broad and liberal discovery'") (quoting *Pacitti v. Macy's*, 193 F.3d 766, 777–78 (3d Cir. 1999)).

Indeed, the documents produced in discovery clearly show that Ostrover and Kirshenbaum were directly involved in the direction and execution of this scheme. (*See supra* at 6-11.) The Subpoena Recipients used a combination of their personal and business emails to discuss the DOI mandate and Walsh's role during this period. (*See, e.g.*, Ex. 6(y) (ORCC_00002051 at -51-56, personal and business emails between Kirshenbaum and MacDonald about the potential Owl Rock investment without Walsh on the email chain); Ex. 6(s) (TW_R45_00004326, ███████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████).) Ostrover, likewise, communicated with Walsh during this period using his personal gmail account to discuss Don Perault of BlackRock, with Walsh promising to "follow up on Don," referring to the progress of his efforts to bring BlackRock in to implement the FAIR program with the DOI. (Ex. 6(o) (TW_R45_00001247 at -47, Feb. 27, 2016 email between Ostrover and Walsh).) After those efforts materialized in March 2016, Ostrover and Kirshenbaum immediately awarded Walsh with an official title. (Ex. 6(m) (TW_R45_00001332 at -32, ████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████.)

The Subpoenas also seek information related to Owl Rock employee, defendant Walsh's, conduct and his relationships with others involved in the RICO enterprise—including Blackrock and its employees, the defendants employed by the DOI, the DOI's consultant Cliffwater, and

Owl Rock itself.  (*See* Exs. 18 & 19 at 17-19, request nos. 6-12, 18.)  These documents, concerning defendant Walsh's relationship with his alleged co-conspirators and co-defendants, are plainly relevant to Blueprint's RICO claims.  *See, e.g.*, *Boyle v. United States*, 556 U.S. 938, 946 (2009) ("An association-in-fact enterprise must have at least three structural features: (i) a purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to permit these associates to pursue the enterprise's purpose."); *id.* (evidence used to prove the pattern of racketeering activity may also establish an association-in-fact enterprise); *Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 265 (D.N.J. 2000) (permitting plaintiff to conduct discovery concerning defendants' knowledge of and role in the alleged fraudulent scheme); *Const. Bank v. Levine*, 151 F.R.D. 278, 280 (E.D. Pa. 1993) (holding documents sought from a non-party pertaining to his business transactions with the defendants were relevant to the plaintiff's racketeering case against all defendants); *Gov't Emps. Ins. Co. v. Pomerantz*, 2022 WL 1081038, at *4 (D.N.J. Apr. 11, 2022) (holding information sought by the subpoenas was clearly relevant and would "reveal the contours of the relationships between the defendants and further details of the alleged fraudulent . . . scheme").

In sum, the subpoenas seek documents plainly relevant to BCA's claims in the Underlying Action.

## II.    THE SUBPOENA RECIPIENTS HAVE AN OBLIGATION TO COMPLY WITH THE SUBPOENAS.

The Subpoena Recipients have no legally valid objection to production of information responsive to the Subpoenas.[5]  Instead, the Subpoena Recipients demand that BCA waive its

---

[5] The Subpoenas were timely served as there is currently no discovery deadline set in the Underlying Action, no depositions in the Underlying Action have been conducted, several document discovery disputes are pending before the District Court of New Jersey, and the parties continue to regularly meet and confer to negotiate outstanding document discovery issues.  *See,*

rights to party discovery from Owl Rock prior to the Subpoena Recipients' compliance. This litigation position has no merit and cannot even fairly be characterized as an objection.

The Subpoena Recipients have independent obligations under Rule 45, and must produce "any nonprivileged matter that is relevant to any party's claims or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). It is clear that Owl Rock has interposed this refusal to produce in order to extract concessions from BCA elsewhere in the case. A party's objection, however, has no effect on a third party's obligation to comply with a subpoena. *See United States ex rel. Ortiz v. Mount Sinai Hosp.*, 169 F. Supp. 3d 538, 544 (S.D.N.Y. 2016) ("[W]hile nothing in Rule 45 prevents a party from serving objections to a non-party subpoena, such objections, standing alone, have no effect on the non-party's obligation to respond to the subpoena."); *Sky Med. Supply Inc. v. SCS Support Claim Servs., Inc.*, 2017 WL 1133349, at *5 (E.D.N.Y. Mar. 24, 2017) ("[A] party's general desire to thwart disclosure of information by a non-party is [ ] not an interest sufficient to create standing."); *see also Oakley*, 2025 WL 72111, at *3 (rejecting argument that prior order limiting party discovery also limited non-parties' discovery obligations because obligations are distinct and separate). As such, conditioning third party subpoena compliance on the resolution of a party's objection is plainly improper.

Finally, the Subpoena Recipients cannot plausibly resist compliance on the basis of an "undue burden." Prior to their about-face, the Subpoena Recipients confirmed that they were

---

*e.g.*, *Siemens Indus., Inc. v. Great Midwest Ins. Co*., 2024 WL 3305602, at *2 (S.D.N.Y. June 4, 2024) ("In order to be timely, [a party's] discovery demands had to be received at least 30 days prior to the close of discovery[.]"). As discovery is ongoing, this motion to compel, likewise, is timely. *Owen v. No Parking Today, Inc.*, 280 F.R.D. 106, 112 (S.D.N.Y. 2011) ("A party ordinarily must file a motion to compel *before* the close of discovery and if it fails to do so, the motion will be deemed untimely."). Indeed, at a hearing late last month, the Magistrate Judge presiding over the Underlying Action made abundantly clear that in light of these disputes, setting a discovery deadline now ███████████████████ (Ex. 6(bb) at 22:8-18.)

"working diligently to collect, review, and produce documents responsive to [Blueprint's] requests." (Ex. 22 at 1.) If such review and production was not overly burdensome in October, is it hard to imagine why it would be today.

## CONCLUSION

For the foregoing reasons, Blueprint respectfully requests that the Court issue an order directing Doug Ostrover and Alan Kirshenbaum to produce all documents responsive to the Subpoenas without further delay.

Dated: March 4, 2025

Respectfully submitted,

**BROWN RUDNICK LLP**

By: _____

Lauren Tabaksblat, Esq.
Michael J. Bowe, Esq.
Andrew T. Sutton, Esq.
Tyler D. Purinton, Esq.
7 Times Square
New York, New York 10036
Telephone: 212.209-4800
Facsimile: 212 209-4801
ltabaksblat@brownrudnick.com
mbowe@brownrudnick.com
atsutton@brownrudnick.com
tpurinton@brownrudnick.com

*Attorneys for Plaintiff Blueprint Capital Advisors, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of March, 2025, I caused a true and correct copy of the foregoing document to be duly served by email upon counsel of record for all parties to the Underlying Action and the Subpoena Recipients.

Dated: March 4, 2025

Lauren Tabaksblat

## CERTIFICATION OF COMPLIANCE PURSUANT TO LOCAL RULE 7.1(c)

I HEREBY CERTIFY that the foregoing memorandum of law complies with the word count limitations set forth in Local Rule 7.1(c) because it contains 6,340 words.

Dated: March 4, 2025

Lauren Tabaksblat